```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF OHIO
                       EASTERN DIVISION
```

William Newkirk,              :

     Plaintiff,           :

  v.                          :         Case No. 2:12-cv-0285

Commissioner of Social        :         JUDGE GEORGE C. SMITH
   Security,                            Magistrate Judge Kemp
                              :
     Defendant.

## REPORT AND RECOMMENDATION

### I. Introduction

Plaintiff, William Newkirk, filed this action seeking review of a decision of the Commissioner of Social Security denying his applications for disability insurance benefits and supplemental security income. Those applications were filed on October 10, 2007, and October 11, 2007, respectively, and alleged that plaintiff became disabled on August 15, 2007.

After initial administrative denials of his applications, plaintiff was given a vidoeconference hearing before an Administrative Law Judge on April 30, 2010. In a decision dated June 9, 2010, the ALJ denied benefits. That became the Commissioner's final decision on February 27, 2012, when the Appeals Council denied review.

After plaintiff filed this case, the Commissioner filed the administrative record on June 8, 2012. Plaintiff filed his statement of specific errors on August 7, 2012. The Commissioner filed a response on October 9, 2012. No reply brief has been filed, and the case is now ready to decide.

### II. Plaintiff's Testimony at the Administrative Hearing

Plaintiff, who was 44 years old at the time of the administrative hearing and who has an eleventh grade education,

with a subsequent GED, testified as follows.  His testimony appears at pages 27-48 of the administrative record.

Plaintiff began by testifying that his daily activity consists mostly of watching television.  He can microwave meals but does no household chores or yard work.

His problems started at work when the vertebrae in his neck began to deteriorate.  He had surgery but has gotten steadily worse.  He deals with chronic pain on a daily basis and takes medication every day to manage it.  Even when he was working, he was forced to take a lengthy medical leave.

Plaintiff testified that his pain worsens with the weather.  He will often wake up and be unable to feel his legs and arms, and such numbness happens other times as well.  He also experiences episodes of blurred vision.  He takes OxyContin for pain and lithium, as well as other medications, for bipolar disease.  He does not socialize but does talk to his son.  He experiences problems with concentration and confusion.

As far as physical capabilities are concerned, plaintiff thought he could walk about a block before either becoming short of breath or having his legs start to hurt.  He is careful how he moves about.  He is afraid to lift anything for fear he will injure his neck.  He did not deal well with stress.

Plaintiff also testified about his past employment.  He last worked for a medical distribution company where he drove a forklift and did other warehouse work.  He had also worked in the construction trades, doing fireproofing and other laboring jobs.  The warehouse job included frequent lifting of weights up to 50 pounds.  In response to questions from the ALJ, plaintiff acknowledged a past history of cocaine use and some alcohol abuse, but said those things had ended.  He would, however, use marijuana occasionally, and one of his physicians had suggested that plaintiff would be subjected to drug tests on occasion.

### III.  The Medical Records

The medical records in this case are found beginning on page 287 of the administrative record.  The pertinent records can be summarized as follows.  The Court will focus mainly on the records relating to plaintiff's mental impairment because that is also the primary focus of his statement of errors.

Plaintiff had neck surgery in 2007, including procedures at C5-6 and C6-7.  The surgery confirmed a pre-operative diagnosis of spondylosis and foraminal stenosis at those levels.  He had been off work since some time in 2006 as a result of this condition.  Four weeks after the surgery, he was experiencing pain but the surgical site was healing well.  He was to start physical therapy shortly thereafter and was not to work for the next several weeks.  (Tr. 361).  When seen by a consultative examiner in early 2008, plaintiff reported no improvement in his neck pain following surgery, nightly pain which woke him up, limits on his ability to stand and walk due to pain, and problems with hip pain in the area where bone was harvested for the surgery.  The examiner, Dr. Harris, thought that physical therapy and medication would reduce the pain and allow plaintiff to perform more activities.  (Tr. 427-29).  A state agency reviewer, Dr. McCloud, concluded that plaintiff could do essentially a full range of light work.  (Tr. 434-41).

Plaintiff underwent a consultative psychological examination on January 2, 2008.  The examiner, Dr. Schulz, reported that plaintiff attributed his inability to work to cervical disc disease and bipolar disorder.  Plaintiff said he had been hospitalized for depression in 2003 or 2004 and had attended mental health counseling for a short while after being released from the hospital.  Plaintiff described a history of alcohol and cocaine use and also said he had been arrested on various charges including DUI, assault, and possession of drug paraphernalia.  He

obtained a GED while in the military. He left his last job due to physical pain. He described his daily activities as being restless and having difficulty concentrating. Dr. Schulz thought plaintiff suffered from bipolar disorder and cocaine abuse and rated his GAF at 51. He concluded that plaintiff was mildly to moderately impaired in his ability to relate to others, was not impaired in his ability to follow instructions or to maintain attention, concentration, or perform simple repetitive tasks, and was moderately to severely impaired in his ability to withstand the stress and pressure of everyday work activity. (Tr. 400-05). Dr. Lewin, a state agency reviewer, concurred with Dr. Schulz' diagnoses and found moderate limitations in plaintiff's ability to deal with detailed instructions, maintain attention and concentration for extended periods, complete a workday or work week without interruption from psychologically-based symptoms, interact with the general public, co-workers or supervisors, and to respond appropriately to changes in the work setting. She thought plaintiff could "handle simple instructions in a low stress work setting where concentration needed is short term and relating is minimized or superficial." (Tr. 408-25).

 A psychiatric consultation note from Dr. Spare dated July 7, 2009 showed that plaintiff had been referred for anger problems and mood swings. Plaintiff described long-term issues with emotional stability and with alcohol and drug use. He was diagnosed with intermittent explosive disorder, PTSD, atypical bipolar disorder, polysubstance abuse, and a character disorder with borderline features. (Tr. 477). When seen a month later, plaintiff looked a little better and was tolerating lithium without difficulty. He was prescribed additional medications. (Tr. 502).

 Dr. Eboh saw plaintiff in 2009 for his neck and back pain. Studies showed a well-healed fusion and there were few

-4-

abnormalities noted on the examination.  Dr. Eboh thought the pain was going to be chronic and he advised against fast-acting narcotic medications.  He had plaintiff sign a controlled substance prescription contract and prescribed OxyContin with monitoring.  (Tr. 586-87).  That dosage was later increased. Dr. Eboh also made a note on August 31, 2009, that plaintiff reported improvement in his psychological symptoms with the lithium and Seroquel, although he was beginning to notice some hand tremors. (Tr. 615).  Later in 2009, Dr. Eboh's notes describe an effort to transition plaintiff's pain medication from OxyContin to morphine or methadone.  By December 7, 2009, Dr. Eboh was reporting that plaintiff was happy with his pain medications and his pain was well-controlled.  (Tr. 625).  A note of February 1, 2010 also shows that plaintiff was again feeling better psychologically due to medication changes.  (Tr. 640).

    The only other pertinent records are progress notes from Dr. Spare.  Collectively, they show that over time, plaintiff continued to have problems being around people, isolating himself and at times being irritable or making inappropriate comments. He also experienced an increase in anger after discontinuing his medications.

### IV.  The Medical Testimony

    A medical expert, Dr. Smiley, was called to testify at the administrative hearing.  His testimony begins on page 48 of the administrative record.

    Dr. Smiley is a retired thoracic and cardiovascular surgeon. He identified plaintiff's documented impairments as degenerative disk disease of the cervical spine status post C6-7 diskectomy and fusion with persistent, radiation pain; a history of substance abuse; and mental impairments which Dr. Smiley was not qualified to evaluate.  He ruled out COPD.  He did not believe that plaintiff's condition satisfied any of the Listing of

-5-

Impairments, but he thought that the combination of chronic pain and bipolar disorder would "make [plaintiff's] ability to function in the work place quite questionable ...." (Tr. 51).

Due to plaintiff's pain and the problems which activity causes, Dr. Smiley thought that plaintiff could do only sedentary work which allowed him to shift positions to deal with positional pain. Climbing would be very dangerous for him.

V. The Vocational Testimony

A vocational expert, Ms. Johnson, also testified at the administrative hearing. Her testimony begins at page 52 of the record. She characterized plaintiff's past work in the warehouse setting as medium and semi-skilled and as a general laborer as medium and unskilled. He did not have any transferable job skills.

Ms. Johnson was asked some questions about a hypothetical person who was limited to working at the sedentary level and who needed a sit-stand option with the ability to move around while seated. The person could not climb ladders, ropes or scaffolding, could only frequently stoop, should not work at unprotected heights, could not work around hazards or dangerous equipment, and could follow only simple job instructions and perform routine, repetitive tasks without high stress or forced pace. That person could also have only occasional contact with co-workers and supervisors and only incidental contact with the general public. With those restrictions, that person could, in Ms. Johnson's view, not do plaintiff's past work, but could perform certain unskilled sedentary jobs such as order clerk, optical goods worker, and surveillance system monitor. Those same jobs would be available to someone with environmental restrictions. However, someone whose ability to attend and concentrate in the work place and to deal with changes in the work setting was poor and who could not have more than incidental

contact with co-workers or supervisors could not do even those jobs.

###### VI. The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 8 through 18 of the administrative record.  The important findings in that decision are as follows.

The Administrative Law Judge found, first, that plaintiff met the insured requirements for disability benefits through December 31, 2011.  Next, plaintiff had not engaged in substantial gainful activity from his alleged onset date of August 15, 2007 through the date of the decision.  As far as plaintiff's impairments are concerned, the ALJ found that plaintiff had severe impairments including degenerative disc disease of the cervical spine, major depressive disorder, bipolar disorder, polysubstance abuse in remission, chronic obstructive pulmonary disease, hip pain and lower back pain.  The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that plaintiff had the residual functional capacity to perform a limited ranged of sedentary work. Plaintiff's lifting, carrying, pushing and pulling were all limited to ten pounds, and he needed a sit-stand option with the ability to shift his weight while sitting.  Also, he could not climb ladders, ropes and scaffolds and could not work at or around unprotected heights or dangerous equipment, in temperature extremes, in damp or dry places, or in places with excessive gasses, fumes, dust, smoke or chemicals.  He could frequently stoop.  The ALJ also found that plaintiff could understand, remember and carry out only simple tasks and instructions, could not handle high stress jobs, could not work at a forced pace or

on an assembly line, and could have only occasional contact with co-workers and supervisors and only incidental contact with the general public.  The ALJ found that, with these restrictions, plaintiff could not perform any of his past relevant work, but he could perform those jobs identified by the vocational expert, such as order clerk, optical goods worker, and surveillance system monitor, and that significant numbers of such jobs existed in the State and national economies.  Consequently, the ALJ concluded that plaintiff was not entitled to benefits.

      VII.   Plaintiff's Statement of Specific Errors

In his statement of specific errors, plaintiff raises three issues.  He argues (1) that the ALJ did not properly evaluate the evidence from the various medical sources including the consultative examining psychologist, the agency reviewing psychologists, and the medical expert; (2) that substantial evidence does not support the ALJ's finding as to plaintiff's mental residual functional capacity; and (3) that substantial evidence does not support the finding that plaintiff is not disabled from the combination of his physical and mental impairments.  The Court generally reviews the administrative decision of a Social Security ALJ under this legal standard:

Standard of Review.  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" Id.  LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  Harris v. Heckler, 756 F.2d 431, 435

(6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

Plaintiff's first claim of error relates to the ALJ's evaluation of the medical evidence. In particular, plaintiff argues that the ALJ disregarded Dr. Schulz' evaluation of his ability to withstand the stress and pressure of everyday work activity, and did not credit the state agency reviewers' various limitations on plaintiff's work activities. Plaintiff also contends that because Dr. Smiley, the medical expert, was unable to assess how the combination of plaintiff's physical and mental impairments affected his ability to work, the ALJ should have obtained additional expert opinion on this point.

The administrative decision is certainly not a model of clarity as to how the evidence from the various mental health professionals was evaluated. It contains a fairly detailed discussion of that evidence as it relates to the question of whether any section of the Listing of Impairments has been met, but there is only a cursory review of the results of Dr. Schulz' examination in the section of the decision devoted to residual functional capacity (Tr. 14), no mention at all of the opinion of Dr. Lewin, and only the briefest reference to one page of treatment notes (from Dr. Eboh, and not Dr. Spare, who was the

treating mental health source) about plaintiff's improvement with psychotropic medication. None of Dr. Spare's progress notes are cited or discussed. Nevertheless, the Commissioner argues that the decision is both supported by substantial evidence and not contrary to law because the ALJ need not cite to every single piece of medical evidence - a proposition supported, according to the Commissioner, by the decision in Morgan v. Astrue, 2011 WL 3714781 (S.D. Ohio July 20, 2011) - and because the residual functional capacity finding is consistent with Dr. Lewin's opinion, even if the ALJ did not explicitly say so. The Commissioner also takes issue with the notion that the record was insufficient to permit the ALJ to reach conclusions about plaintiff's mental residual functional capacity without additional evidence from a mental health expert.

    The Court is troubled by the ALJ's failure even to acknowledge significant portions of the record dealing with plaintiff's mental impairments and the limitations they caused. In the Court's experience, it is highly unusual for an ALJ who, as appears to have occurred in this case, adopts almost *verbatim* the limitations contained in a state agency reviewer's report never to mention that report in his discussion of residual functional capacity. Had the ALJ's findings conflicted in any substantial way with the conclusions of Dr. Schulz or Dr. Lewin, this lack of discussion would present extreme difficulties for the Court in determining exactly how the ALJ reached his ultimate conclusion, and how and why he discounted the opinions of the examining and reviewing experts. That type of conflict does not exist here, however, because, as noted, the ALJ's assessment of plaintiff's ability to work from a mental standpoint is almost exactly the narrative assessment given by Dr. Lewin, and Dr. Lewin's report, like the section of Dr. Schulz' report which plaintiff claims was ignored, is based on a finding that plaintiff has moderate difficulty in dealing with work stress.

The Court is entitled to review evidence not cited by the ALJ in determining if the administrative decision is supported by substantial evidence. Simmons v. Barnhart, 114 Fed. Appx. 727, 733 (6th Cir. Nov. 18, 2004). Further, "an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000). As in that case, the Court finds it "unlikely" that the ALJ failed to review Dr. Lewin's report when there is no other source from which the ALJ could reasonably have derived the limitations he incorporated into his residual functional capacity finding. It is also important to note that Dr. Spare did not comment on plaintiff's work-related abilities in any of his reports, and that plaintiff has not cited to any evidence which would undermine the ALJ's apparent reliance on Dr. Lewin; although plaintiff contends that the ALJ disregarded Dr. Lewin's findings as set forth at Tr. 422-23, that can hardly be true, because Dr. Lewin's report specifically took those limitations into account in concluding that plaintiff could handle simple instructions in a low stress work setting with minimal contact with others, and the ALJ made a similar if not identical finding.

As the Court of Appeals has observed, if an ALJ agrees with the opinion of a particular physician, the "failure to give reasons for the amount of weight placed on [that] opinion is, at most, harmless error." Pasco v. Comm'r of Social Security, 137 Fed. Appx. 828, 840 (6th Cir. June 23, 2005). That seems to be the case here. Although it would have been better for the ALJ to have been more explicit about his adoption of Dr. Lewin's conclusion, and to have discussed the significance, if any, of the progress notes from Dr. Spare, in the absence of any indication that plaintiff was prejudiced by these failures, they cannot serve as the basis for a remand.

Plaintiff's second argument is not substantially different

from his first, and also focuses on the residual mental functional capacity finding. After reviewing the records from Marion Area Counseling Center and Dr. Schulz' opinion, plaintiff contends that this evidence "supports greater nonexertional limitations that those recognized by the ALJ making his residual functional capacity unsupported by substantial evidence in the record." *Statement of Errors*, Doc. 12, at 17. He then argues that because this finding is not properly supported, the vocational expert's testimony, which was based on the ALJ's purportedly flawed assessment, is also unreliable.

  The Court agrees with the Commissioner that this argument suffers from a fundamental flaw; it equates the existence of evidence of greater limitations with the absence of evidence for less severe limitations. The two are not the same. Further, the Court has already explained why it does not believe that Dr. Schulz' opinion was actually disregarded and why the ALJ reasonably took it into account, and why nothing in the progress notes directly contradicts the ALJ's residual functional capacity assessment. For these reasons, the Court finds plaintiff's second claim of error to be without merit.

  Plaintiff's final argument is that the ALJ erred by not finding him disabled due to the combined effect of his physical and mental limitations. The only evidence to support this argument is Dr. Smiley's statement, made after he acknowledged that he could not comment on the mental health issues in the case, that it would appear questionable whether someone with plaintiff's physical limitations and with bipolar disorder could function in the workplace.

  The effect of a combination of mental and physical impairments is usually determined by posing a hypothetical question to a vocational expert which incorporates the limitations imposed by each separate impairment. As this Court has noted, "[t]he administrative law judge must accurately state

each limitation that affects the claimant's ability to work." Clutter v. Comm'r of Social Security, 2009 WL 3620798, *8 (S.D. Ohio Oct. 29, 2009).  If the hypothetical question is accurate and incorporates all of the limitations stemming from each of the plaintiff's medically determinable impairments, it demonstrates that the ALJ "fully considered" the combined effect of those impairments.  See Bishop v. Shalala, 64 F.3d 682 (6th Cir. August 15, 1995)(unreported).  That is the case here.  The hypothetical question posed to Ms. Johnson incorporated both physical and mental restrictions, and this Court has found no error in the ALJ's assessment of plaintiff's residual functional capacity from both a physical and mental standpoint.  Therefore, this third statement of error does not support either a reversal or a remand.

## VIII.  Recommended Decision

Based on the above discussion, it is recommended that the plaintiff's statement of errors be overruled and that judgment be entered in favor of the defendant Commissioner of Social Security.

## IX.  Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions  of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to

object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation <u>de novo</u>, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  <u>See Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981).

<u>/s/ Terence P. Kemp</u>
United States Magistrate Judge
